**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>    v.<br><br>JOHN E. BECKSTEDT, MARK HEARSH, Individually and as Trustee of the JOHN E. BECKSTEDT SR. 2011 IRREVOCABLE LIFE INSURANCE TRUST, GUY IANTONI and GTI LIFE, INC.,<br><br>        Defendants. | Case No. 13 cv 03853<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF** |

Plaintiff, Nationwide Life and Annuity Insurance Company ("Nationwide"), by and through its attorneys, Drinker Biddle & Reath LLP, hereby files this Complaint for Declaratory Judgment and other relief, and in support thereof, avers as follows:

1.      This complaint asserts claims for fraud, negligent misrepresentation, conspiracy, breach of contract, violation of the Illinois Viatical Settlements Act of 2009, § 215 ILCS 159/1 *et seq.*, and declaratory judgment pursuant to 28 U.S.C. § 2201 stemming from the fraudulent procurement of life insurance. Nationwide is entitled to the relief it seeks because of, *inter alia*, misrepresentations made to Nationwide for this life insurance and the concealment of certain material facts that the Defendants knew and should have communicated to Nationwide.

2.      Specifically, the statements provided in the application submitted to Nationwide for the life insurance policy at issue (the "Policy") contained certain questions intended to discern, among other things, whether the Policy was supported by an insurable interest and whether the premium for the Policy would be funded by a third party. The Defendants, however,

1

provided false information in response to these questions. Had accurate information been disclosed to Nationwide, Nationwide would have declined to issue the Policy.

3.      Further, upon information and belief, the Policy was procured for the purpose of transferring it, either directly or indirectly, into the secondary market for life insurance. Accordingly, the Policy was not merely the product of fraud; it is also an illegal wagering contract.

4.      Nationwide seeks equitable relief in the form of a declaration that the Policy is void *ab initio* because (i) the Policy was procured based on material misrepresentations in the Policy application; and (ii) the Policy was not supported by a valid insurable interest at issuance. Nationwide further seeks a declaration that Defendants are estopped from seeking a return of premium in connection with the Policy. To the extent that the Defendants are not estopped from seeking a return of premium, Nationwide alternatively seeks equitable relief in the form of a declaration that Nationwide is entitled to offset any return of premium by the costs it incurred in connection with the Policy. Nationwide also seeks a return of commissions paid in connection with the Policy, as well as compensatory and punitive damages.

5.      Nationwide will continue to treat the Policy as in-force unless and until it receives the relief it seeks from the Court in this declaratory judgment action (and/or the Policy otherwise lapses). Nationwide's treatment of the Policy as in-force is not intended to be a waiver of any of the positions asserted in this action or any other rights under the Policy or at law.

## THE PARTIES

6.      Plaintiff Nationwide is a corporation organized and existing under the laws of Ohio, with its principal place of business and nerve center located at One Nationwide Plaza, Columbus, Ohio 43215-2220.  Nationwide is a citizen of the State of Ohio.

7.      Upon information and belief, Defendant John E. Beckstedt ("Beckstedt" or the "Insured") is a natural citizen of the State of Illinois who resides at 1041 Dell Road, Northbrook, Illinois, 60062.  A policy of insurance was procured on Beckstedt's life.

8.      Upon information and belief, Defendant Mark Hearsh ("Hearsh") is the Trustee of the John E. Beckstedt Sr. 2011 Irrevocable Life Insurance Trust (the "Trust") and is named as a defendant both individually and as Trustee of the Trust.  Upon information and belief, Defendant Hearsh is a natural citizen of the State of Illinois who resides at 1980 Lewis Lane, Highland Park, Illinois, 60035.

9.      Upon information and belief, Defendant Guy T. Iantoni ("Iantoni") is a natural citizen of the State of Illinois who resides at 2101 Magnolia Lane, Highland Park, Illinois, 60035.  Upon information and belief, and at all times relevant hereto, Iantoni was an insurance producer engaged in the business of producing and servicing insurance policies, and regularly doing so in the State of Illinois.  Iantoni was the insurance producer responsible for placing the Policy with Nationwide.

10.     Upon information and belief, Defendant GTI Life, Inc. ("GTI") is a corporation which is organized under the laws of the State of Illinois, with its principal place of business and nerve center at 633 Skokie Boulevard, Suite 250, Northbrook, Illinois 60062.  GTI is a citizen of the State of Illinois.  Iantoni is the President of GTI and GTI was also involved in the procurement of the Policy.

3

11.     At all times relevant and mentioned herein, upon information and belief, Beckstedt, Hearsh, Iantoni, GTI and/or others conspired together in a scheme or plan to procure the Policy and, in performing the acts alleged in this complaint, were acting as the agents, employees, joint venturers and/or representatives of each other, and were acting within the full course and scope of their agency, employment, and/or representation with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each other.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(b)(1) and (2), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Nationwide and Defendants.  Specifically, Nationwide seeks (i) a declaratory judgment regarding the validity of a $5 million life insurance policy; (ii) a declaration that it may retain the premium paid on the life insurance policy in the amount of $158,200; and (iii) compensatory damages including but not limited to the costs and expenses incurred in connection with the life insurance policy at issue which includes commission paid in the amount of $189,840.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to the claims occurred herein.

## FACTUAL BACKGROUND

### A.     The Fraudulent Insurance Transaction at Issue

14.     Beginning sometime prior to June 22, 2011, Beckstedt, Hearsh, Iantoni, GTI and/or other individuals or entities (the "Promoters") looking to acquire the beneficial interest in the life insurance Policy for investment purposes (the "Investors") executed an improper and

fraudulent stranger-originated life insurance ("STOLI") scheme to procure a life insurance policy from Nationwide.

15.     A STOLI arrangement is a speculative investment created when a life insurance policy is applied for and issued at the behest of individuals or entities with no insurable interest in the life of the insured, who later acquire some or all of the interest in the death benefit payable upon the death of the insured.  Unlawful STOLI arrangements typically begin when a STOLI promoter searches for and finds a high net worth elderly person to apply for a high face value insurance policy.  The high face value of the policy combined with the insurance applicant's limited life expectancy creates an attractive but speculative investment vehicle for third party investors who surreptitiously fund the premium payments in exchange for substantial commissions and/or the right to receive the death benefit under the policy.

16.     Upon information and belief, the Promoters had a scheme in place well before the Policy was issued to get around the prohibition against illegal wagering contracts.

17.     Upon information and belief, the Promoters encouraged the Insured to participate in an illegal STOLI scheme whereby a large face value life insurance policy would be applied for – a policy that, if issued, would (i) typically provide greater coverage for the Insured than he needed or could otherwise afford; (ii) generate substantial commissions for the Promoters, and/or (iii) lead to a sale of the Policy in the secondary life insurance market for the benefit of the Investors.

18.     Upon information and belief, the scheme in which the Defendants participated involved the procurement of the Policy without the Insured, any of his family members or anyone with a valid insurable interest in the Insured's life funding the cost of the Policy,

including the premium.  Rather, those costs were paid by third parties who were strangers to the Insured.

19.     Upon information and belief, pursuant to the STOLI scheme, the Promoters advised the Insured that he would not have to pay for premium on the Policy in order to have it placed in force.  Rather, premiums would be funded by a third party.  Further, false information was provided on the application and supplement to the Policy application regarding (i) whether there had been discussions about the possible sale or assignment of the Policy to a life settlement, viatical or other secondary market purchaser; (ii) whether any portion of the current or future premium for the Policy would be financed; (iii) whether payment would be received in connection with the insurance issued on the basis of the Application; and (iv) the purpose for which the Policy was being procured.

20.     In order to make the procurement of the life insurance policy appear legitimate and to conceal the scheme from Nationwide, upon information and belief, the Trust was created to be the record owner and beneficiary of the Policy. As part of the scheme, the Trust was created bearing the name of the Insured as the putative owner and beneficiary of the Policy.  The purpose of identifying the Trust as the Policy's beneficiary was to make it appear that both the Policy and the Trust was intended for legitimate purposes, and to make it appear as though the Trust had an insurable interest in the life of the Insured.  However, upon information and belief, the Trust was a straw entity intended to lend the appearance of a valid insurable interest where none existed.

21.     Upon information and belief, the Policy involved in this STOLI scheme was funded and financed by the Promoters.  Further, the Promoters purposely concealed the funding and financing scheme from Nationwide by issuing payments in the amount of the premium due

6

on the Policy into the bank account of the Trust, which directed premium payments to Nationwide.

22.     Upon information and belief, the Promoters collaborated on the procurement of the STOLI Policy.  Upon information and belief, in reality, and from the outset, the Policy was applied for in order to (i) generate significant commissions to benefit the Promoters, and/or (ii) generate a large profit for the Investors upon the eventual death of the insured or sale of the beneficial interest in the Policy in the secondary market for life insurance.

### B.     GTI Life, Inc. and Guy T. Iantoni

23.     On or about June 24, 2010, Iantoni signed a Master Sub-Distributor Agreement ("Sub-Distributor Agreement") on behalf of GTI Life, Inc. ("GTI").  The Sub-Distributor Agreement permitted GTI to market, distribute and administer Nationwide insurance products as an independent contractor.  *See* a copy of the Sub-Distributor Agreement attached as Exhibit "A", ¶¶A, C, 1.5.

24.     The Sub-Distributor Agreement is governed by Ohio Law.  *Id.* at ¶ 9.8.

25.     In the Sub-Distributor Agreement, GTI agreed, *inter alia*, that it would "conduct its activities pertaining to [the Agreement] in material conformity with all applicable federal and state laws and/or regulations."  *Id.* at p. 2.  GTI also agreed to "comply with all lawful rules, practices, instructions, regulations, procedures and guidelines" as established by Nationwide.  *Id.* at ¶ 1.4.

26.     In the Sub-Distributor Agreement, GTI also agreed that it had no authority to "directly or indirectly rebate any portion of the premium to the insured or to any other party" or to "induce or attempt to induce any policyholder … to relinquish … their polic[y]."  *Id.* at ¶¶ j, l.

27.     In the Sub-Distributor Agreement, Nationwide agreed to pay GTI compensation in consideration for the services provided by GTI in the form of commissions.  *Id*. at ¶ 4.1

28.     The Sub-Distributor Agreement provides that if Nationwide refunds premiums for any reason, GTI shall immediately repay Nationwide all such compensation or other payments. *Id*. at ¶ 4.5.

29.     GTI further agreed to indemnify Nationwide, *inter alia*, for "any and all losses, claims, damages, liabilities or expenses" incurred by Nationwide "as a direct consequence of" (i) "any material misrepresentation or omission" or "alleged misrepresentation or omission involving the sales subject to this Agreement"; (ii) "any failure by Sub-Distributor, its Agents or affiliated agencies, whether negligent or intentional, to perform the duties and discharge the obligations contemplated in this Agreement"; or (iii) "any fraudulent, unauthorized or wrongful acts or omission by Sub-Distributor, its Agents or affiliated agencies."  *Id.* at p. 4 ¶¶ 1-3.

30.     Iantoni was appointed, *inter alia*, as a GTI "Agent" within the meaning of the Sub-Distributor Agreement.

31.     Upon information and belief, in furtherance of the fraudulent insurance scheme, Iantoni submitted, through GTI, a formal application for life insurance on the life of Beckstedt to Nationwide in approximately June of 2011.

C.     **The Beckstedt Policy**

i.     **The Beckstedt Policy Application**

32.     Upon information and belief, in furtherance of Defendants' fraudulent scheme, on or about June 2, 2011, Defendants submitted a formal application (the "Application") to Nationwide seeking $5,000,000 in coverage on the life of Beckstedt.  At the time of the Application, Beckstedt was 64 years old.

8

33. The Application was purportedly signed in Northbrook, Illinois on June 2, 2011 by Beckstedt (as the proposed insured), Hearsh (as the trustee of the proposed owner) and Iantoni (as the insurance producer). The Trust was designated as the owner and beneficiary of the Policy.

34. Upon information and belief, although the Insured signed the Application, he did not take out the Policy on his own, nor did he exercise unfettered control over it.

35. The Application asked, *inter alia*, the following questions: "(16(k)) Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market purchaser? . . . (16(m)) Will any portion of the current or future premium for this policy be financed? (16(n)) Will any Insured or Policy Owner receive any payment in connection with the insurance issued on the basis of this application?" The Insured and Hearsh answered "no" to all of the above questions on the Application.

36. In signing the Application, the Insured and Hearsh agreed that the "application, any amendments to it, and any related medical examination(s) will become part of the Policy and are the basis of any insurance issued upon th[e] application."

37. The Application contained a Fraud Statement advising that "Any person who submits an application or a claim containing a false or deceptive statement and does so with intent to defraud or knowing that he/she is facilitating a fraud against an insurer may be guilty of insurance fraud."

38. On or about June 9, 2011, a Life Financial Supplement to Application (the "Financial Supplement") was submitted in connection with the Application and signed by the Insured, Hearsh and Iantoni. The Financial Supplement represented that in the calendar year ending 2010, the Insured had a salary of $300,000, $450,000 in savings, stocks and bonds,

$1,750,000 in notes and accounts receivable, $400,000 in real estate – other, $31,500,000 in net business interest, $350,000 in personal property, a personal net worth of $34,295,000 and that the purpose of the insurance was for "estate conservation."

39.     The Financial Supplement asked, *inter alia*, the following questions:  "(10) Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider? . . . (12) Will any portion of the premium for this policy be financed?  (13) Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?"  The Insured and Hearsh answered "no" to all of the above questions on the Financial Supplement.

40.     In signing the Financial Supplement, the Insured and Hearsh represented that they understood that Nationwide would rely on their statements therein in determining the need and justification for the insurance applied for, and represented that the answers provided were true.

41.     On or about June 21, 2011, Iantoni and GTI submitted a Producer's Certificate in connection with the Application.  On the Producer's Certificate, Iantoni and GTI represented the Insured's annual income, net worth and the purpose of the insurance.

### ii.     Misrepresentations Regarding the Policy

42.     Upon information and belief, the aforementioned information contained in the Application, Financial Supplement and Producer's Certificate was false and the Insured, Hearsh, Iantoni and GTI knew or should have known that such information was false.

43.     Upon information and belief, the information provided on the Application and Financial Supplement was false because: (i) the Insured and/or Hearsh had been involved in discussions about the possible sale or assignment of the Policy to a life settlement, viatical or other secondary market purchaser; (ii) it was intended that premiums on the Policy would be

financed; (iii) it was intended that the Insured and/or the Trust would receive payment in connection with the issuance of the Policy; and (iv) the Policy was not procured for the purpose of "estate conservation" or "estate succession."

44.     Discovery may reveal that there were additional misrepresentations in the Application, the Financial Supplement, and/or the Producer's Certificate.

45.     On or about July 7, 2011, Nationwide received a premium payment on the Policy in the amount of $158,200 via wire transfer from the Trust.  Upon information and belief, a person or entity without an insurable interest in the Insured's life provided the Trust with the funds to pay the premium by depositing $158,200 into the account of the Trust.

46.     Upon information and belief, the deposit was intended to conceal from Nationwide the fact that the funds used to pay premium on the Policy did not originate from the Insured or anyone with an insurable interest in his life.  Rather, upon information and belief, the premium on the Policy was funded directly or indirectly by the Promoters and/or Investors and/or others working with them and/or on their behalf.

47.     Upon information and belief, at no time was there an intent for a person with an insurable interest in the Insured's life to retain a beneficial interest in the Policy and, consequently, the right to receive the death benefit payable under the Policy.  Instead, upon information and belief, the Policy was procured pursuant to a plan and agreement predating the application for, and the issuance of, the Policy to procure the Policy and transfer the Policy to an Investor with no insurable interest in the Insured's life.

48.     Upon information and belief, at the time that they submitted the Application, Financial Supplement and Producer's Certificate to Nationwide, Iantoni and GTI knew that these

materials contained the aforementioned misrepresentations and knew that Nationwide would rely upon the accuracy of the aforementioned representations in deciding whether to issue the Policy.

49.     Upon information and belief, the Policy was never intended to provide estate conservation for the Insured, and the aforementioned misrepresentations were made in the Application, the Financial Supplement and Producer's Certificate to conceal the true purpose of the insurance, which was to financially benefit the Promoters and Investors which lacked an insurable interest in the Insured's life.

### iii.     Issuance of the Policy

50.     Based upon the Application, the Financial Supplement, the Producer's Certificate and the representations contained therein, a policy insuring the Insured's life was approved by Nationwide for $5,000,000 in coverage.  Policy number B500387630 (i.e., the "Policy") was issued by Nationwide on June 22, 2011 and given an effective date of June 17, 2011.

51.     The misrepresentations in the Application, Financial Supplement and Producer's Certificate as described above were material in that they induced Nationwide to issue the Policy. Nationwide would not have issued the Policy had the questions contained in the Application, Financial Supplement and Producer's Certificate been answered truthfully.

### D.     Premium Received and Commission Paid on the Policy

52.     Nationwide received a total of $158,200 in premium on the Policy.

53.     In reliance upon the apparent validity of the Policy, Nationwide paid a total of $189,840 in commissions on the Policy.

## COUNT I

## BREACH OF CONTRACT

### (Against GTI)

54.     Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

55.     Upon information and belief, GTI breached its Sub-Distributor Agreement with Nationwide by and through the actions of its President, Iantoni, by: (i) soliciting, directly or indirectly, the Insured's and others' participation in a STOLI arrangement; (ii) submitting an Application for a Policy to Nationwide which GTI knew lacked an insurable interest and/or contained material misrepresentations; (iii) participating in, facilitating, or directing the establishment of the Trust to conceal the absence of an insurable interest in connection with the Policy; (iv) violating applicable law and regulations through involvement in the STOLI scheme; (v) paying premiums on the Policy or rebating premiums or commissions directly or indirectly; (vi) soliciting and/or facilitating the transfer of the beneficial interest in the Policy; and (vii) concealing from Nationwide that there was a lack of an insurable interest at the inception of the Policy and that the Application, the Financial Supplement and the Producer's Certificate contained material inaccuracies.

56.     Nationwide has incurred substantial damages as a proximate result of GTI's wrongful conduct and breach of the Sub-Distributor Agreement, including, among other things, costs and expenses associated with the issuance of the Policy, payment of commission on the Policy and other expenses incurred.

57.     Furthermore, in the event that the Policy is not declared void, Nationwide will incur damages in the amount of the death benefit to be paid on the Policy.  Such damages are a result of GTI's wrongful conduct and breach of contract.

58.     Moreover, if Nationwide is required to refund any portion of the premium, GTI is contractually obligated to return the corresponding commission pursuant to the terms of the Sub-Distributor's Agreement.

**COUNT II**

**INDEMNIFICATION**

**(Against GTI)**

59.     Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

60.     As set forth above, GTI and Nationwide entered into the Sub-Distributor Agreement.

61.     The Sub-Distributor Agreement provides that GTI will indemnify Nationwide, *inter alia*, for "any and all losses, claims, damages, liabilities or expenses" incurred by Nationwide as a "direct consequence" of (i) "any material misrepresentation or omission" or "misrepresentation or omission involving the sales subject to this Agreement"; (ii) "any failure by Sub-Distributor, its Agents or affiliated agencies, whether negligent or intentional, to perform the duties and discharge the obligations contemplated in this Agreement"; or (iii) "any fraudulent, unauthorized or wrongful acts or omissions by Sub-Distributor, its Agents or affiliated agencies."

62.     The Policy was procured pursuant to the Sub-Distributor Agreement.

14

63.     To the extent that Nationwide has incurred or will incur any losses, damages, liabilities or expenses in connection with the Policy as a direct consequence of the acts or omissions of GTI, its Agents, including those of GTI's President, Iantoni, or affiliated agencies, Nationwide is entitled to indemnification from GTI.

## COUNT III

## DECLARATORY JUDGMENT –

## MATERIAL FRAUDULENT MISREPRESENTATIONS VOIDING THE POLICY

64.     Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

65.     Upon information and belief, the Insured and Hearsh made material misrepresentations to Nationwide in the Application and Financial Supplement.

66.     Upon information and belief, the Insured, Hearsh and Iantoni knew of the falsity of the representations concerning: (i) whether there were discussions about the possible sale or assignment of the Policy to a life settlement, viatical, or other secondary market provider; (ii) whether the current or future premiums on the Policy being applied for would be financed; (iii) whether payment would be received in connection with the insurance issued on the basis of the Application; and (iv) the purpose for which the Policy was being procured.

67.     In the Application and the Financial Supplement, the Insured and Hearsh certified the truth of the representations that they respectively made in the Application and the Financial Supplement.

68.     In signing the Application, the Insured and Hearsh also agreed that the insurance would "only take effect when (1) a policy is issued by Nationwide and accepted by [the Insured]; and (2) the full first premium is paid; and (3) all the answers and statements made on the

application, medical examination(s) and amendments are true on the best of [their] knowledge and belief when (1) and (2) have occurred."

69.     Therefore, in completing and signing the Application and the Financial Supplement, the Insured and Hearsh knew that (1) they were required to provide truthful and accurate responses to the questions presented, (2) Nationwide would rely upon the accuracy of the answers contained in the Application and the Financial Supplement in determining whether to issue a life insurance policy insuring the life of the Insured, and (3) the Policy would only take effect if the representations made therein remained accurate at the time of policy delivery and premium receipt.

70.     Nationwide justifiably relied on the aforementioned representations.

71.     The aforementioned representations were material in that they induced Nationwide to issue the Policy.

72.     Nationwide would not have issued the Policy if the information in the Application and Financial Supplement had been answered truthfully.

73.     Nationwide is thus entitled to a judicial declaration that, pursuant to applicable law, the Policy is void, as it was issued by Nationwide in reliance upon material misrepresentations, or, in the alternative, that the misrepresentations constitute grounds for rescission of the Policy by Nationwide.

## COUNT IV

## <u>DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST</u>

74.     Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

16

75.     On the facts averred above, there is now an actual controversy of a justiciable nature as to whether the Policy was procured at the behest of, and/or under the direction of, a party or parties with no insurable interest in the life of the Insured and/or as part of a plan, intention and agreement to conceal that there was a lack of insurable interest in connection with the Policy.

76.     Upon information and belief, at the time the Policy was issued, the Defendants had a plan, scheme or design to, and with an agreement in place to, sell the Policy and/or the beneficial interest in the Trust owning the Policy to a third party on the secondary market for life insurance.

77.     Upon information and belief, the Policy was procured as a mere cover for a wager on the life of the Insured and the purpose of the transaction was to gamble upon the life of the Insured.

78.     Upon information and belief, the true purpose of the Policy was to financially benefit the Promoters and Investors who lacked an insurable interest in the life of the Insured.

79.     Upon information and belief, neither the Insured or anyone with an insurable interest in the life of the Insured actually paid for the premium for the Policy, as funding for the premium payment came from third parties lacking an insurable interest in the Insured's life. Therefore, the Insured did not actually procure or effect the Policy.

80.     Upon information and belief, the Insured was induced to permit the procurement of the Policy with the intent to transfer the Policy to third parties with no insurable interest in the Insured's life.

**81.** Nationwide is entitled to a judicial declaration, in view of the Policy's apparent origin, that the Policy was unsupported at the time of its procurement by any legally cognizable insurable interest and is void *ab initio*.

## COUNT V

## NEGLIGENT MISREPRESENTATION

### (Against all Defendants)

82. Nationwide hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

83. Upon information and belief, the Insured and Hearsh made misrepresentations regarding, among other things: (i) whether there had been discussions about the possible sale or assignment of the Policy to a life settlement, viatical or other secondary market purchaser; (ii) whether any portion of the current or future premium on the Policy would be financed; (iii) whether payment would be received in connection with the insurance issued on the basis of the Application; and (iv) the purpose for which the Policy was being procured. The Insured and Hearsh also misrepresented that the answers provided on the Application and Financial Supplement were true.

84. Upon information and belief, Iantoni and GTI by and through the actions of its President, Iantoni, made statements of material fact to Nationwide by falsely certifying on the Producer's Certificate the purpose of the insurance.

85. The statements of material fact made by Defendants were false and made without the exercise of reasonable care.

86. Defendants should have known that each of these statements were false, or were made without reasonable grounds for believing them to be true.

87.     Iantoni, GTI and Hearsh made these statements in the course of their business, profession or employment, intending or expecting that Nationwide would be guided by these statements and rely upon them in issuing the Policy.

88.     Iantoni and GTI had a duty to disclose to Nationwide correct and complete information in connection with the Application for the Policy.

89.     Nationwide reasonably and justifiably relied on the statements of Defendants in issuing the Policy.

90.     Nationwide lacked knowledge of the falsity of the statements.

91.     Nationwide would not have issued the Policy had it known the true facts surrounding the procurement of the Policy.

92.     As a proximate result of the negligent misrepresentations made by Defendants, Nationwide has sustained and will continue to sustain damages.

## COUNT VI

## FRAUD

### (Against all Defendants)

93.     Nationwide hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

94.     Upon information and belief, the Insured and Hearsh made fraudulent misrepresentations regarding, among other things: (i) whether there had been discussions about the possible sale or assignment of the Policy to a life settlement, viatical or other secondary market purchaser; (ii) whether any portion of the current or future premiums on the Policy would be financed; (iii) whether payment would be received in connection with the insurance issued on the basis of the Application; and (iv) the purpose for which the Policy was being procured.  The

Insured and Hearsh also fraudulently misrepresented that the answers provided on the Application and Financial Supplement were true.

95.     Upon information and belief, Iantoni and GTI by and through the actions of its President, Iantoni, made fraudulent statements of material fact to Nationwide by falsely certifying on the Producer's Certificate the purpose of the insurance.

96.     Defendants intentionally made the aforementioned misrepresentations knowing they were false or with utter disregard and recklessness as to their falsity with the intention that Nationwide would rely upon them in issuing the Policy.

97.     Each of the aforesaid fraudulent misrepresentations was material to Nationwide's decision to issue the Policy, and Nationwide justifiably relied on these representations in issuing the Policy.  Indeed, Nationwide would not have issued the Policy if the representations in the Application, Financial Supplement and Producer's Certificate had been truthful or if Nationwide had known the true facts surrounding the procurement of the Policy.

98.     As a result of the wrongful conduct of the Defendants, Nationwide has sustained and will continue to sustain damages.

99.     Nationwide is also entitled to an award of punitive damages based on the wanton, malicious, deliberate and/or grossly negligent conduct of Defendants as described herein.

## COUNT VII

## CONSPIRACY

### (Against all Defendants)

100.    Nationwide hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

101. Upon information and belief, the Defendants and others conspired and agreed to commit a fraud to induce Nationwide to issue the Policy by, among other things, maliciously combining, participating in, facilitating, and/or directing the: (i) solicitation of the Insured to participate in the STOLI scheme; (ii) submission of the Application and the Financial Supplement and related documents to Nationwide; (iii) use of the Trust to conceal the absence of an insurable interest in connection with the Policy in violation of applicable insurance laws; (iv) concealment from Nationwide that there was a lack of an insurable interest at the inception of the Policy, that there had been a discussion regarding the possible sale or assignment of the Policy to a life settlement, viatical or other secondary market purchaser or provider, that it was intended that the current or future premiums on the Policy would be financed, that it was intended that payment would be received in connection with the insurance issued on the basis of the Application, and the true reason for which the Policy was procured; and (v) concealment from Nationwide of the scheme to transfer the Trust and/or Policy's beneficial interest.

102. Upon information and belief, in furtherance of their collaborative and conspiratorial combination and agreement to commit a fraud against Nationwide, the Defendants knowingly and purposefully concealed the lack of any insurable interest in connection with the Policy and knowingly and purposefully placed (and/or caused to be placed) false information on the Application, the Financial Supplement and the Producer's Certificate in order to induce Nationwide to issue the Policy. At all material times hereto, Defendants acted in furtherance of a common plan intended to benefit themselves and profit from the scheme at the expense of Nationwide.

103. Upon information and belief, Defendants knew of their own concealment, and that of their co-conspirators, regarding the lack of insurable interest and the fraudulent

misrepresentations made in connection with the Policy. Further, each knew that Nationwide

would rely on these acts in determining whether to issue the Policy. Defendants furthered this

conspiracy by, among other things, concealing the lack of any insurable interest in the Policy by

providing false information on the Application, the Financial Supplement and the Producer's

Certificate and/or failing to correct false information, and providing the funds required to procure

and maintain the Policy.

104.    As a result of the wrongful and malicious conduct of the Defendants, Nationwide

has sustained and will continue to sustain the aforementioned damages and may sustain

additional damages in the future. Such damages are a result of the collective fraud of the

Defendants and the concealment of their fraud, which prevented Nationwide from discovering

the misrepresentations in the Application, the Financial Supplement and the Producer's

Certificate.

## COUNT VIII

## <u>VIOLATIONS OF THE ILLINOIS VIATICAL SETTLEMENTS ACT OF 2009</u>

### (Against all Defendants)

105.    Nationwide hereby incorporates by reference each and every averment of fact

contained in the preceding paragraphs as if set forth herein at length.

106.    It is a violation of the Illinois Viatical Settlements Act of 2009, § 215 ILCS 159/1

*et seq.* (the "Act") for any person to (i) enter into a viatical settlement contract prior to the

application of or issuance of a policy that is the subject of a viatical settlement contract; (ii)

solicit or market the purchase of an insurance policy for the purpose of settling the policy; (iii)

make any statement or representation to a potential or actual insured in connection with the sale

or financing of a life insurance policy to the effect that the insurance is free or without cost to the

policyholder for any period of time (unless provided for in the policy); or (iv) enter into a viatical

settlement contract within two years of the issuance of the policy, unless certain conditions are

met.  § 215 ILCS 159/50, 55.

107.    The Act prohibits certain fraudulent viatical settlement acts by any person who,

knowingly and for the purpose of depriving another of property or for pecuniary gain, presents,

causes to be presented, or prepares with knowledge or belief that it will be presented to or by a

viatical settlement provider, viatical settlement broker, viatical settlement purchaser, financing

entity, insurer, insurance producer, or any other person, false material information, or conceals

material information, as part of, in support of, or concerning a fact material to, *inter alia*,: (i) an

application for the issuance of an insurance policy; (ii) the underwriting of an insurance policy;

(iii) premiums paid on an insurance policy; or (iv) in the solicitation, offer, effectuation or sale of

an insurance policy.  § 215 ILCS 159/72(d)(1)(A)(i)-(vii).

108.    Viatical settlement fraud is committed when a person knowingly and for the

purpose of depriving another of property or for pecuniary gain, enters into any act, practice or

arrangement which involves stranger-originated life insurance.  § 215 ILCS 159/72(d)(1)(c).

Under the Act, this is defined as an act, practice or arrangement to initiate a life insurance policy

for the benefit of a third-party investor who, at the time of policy origination, has no insurable

interest in the insured.  STOLI practices include cases where life insurance is purchased with

resources or guarantees from persons or entities who could not lawfully initiate the policy at the

time of policy inception, and where, at the time of inception, there is verbal or written

arrangement or agreement to transfer ownership of the policy or benefits of the policy to a third

party.  § 215 ILCS 159/5.

109.    It is a violation of the Act to recklessly enter into, negotiate, broker or otherwise deal in a viatical settlement contract involving a life insurance policy that was obtained by presenting false information concerning any fact material to the policy, or by concealing information concerning any fact material to the policy for the purpose of misleading and with the intent to defraud the issuer of the policy, the viatical settlement provider or the viator.  § 215 ILCS 159/72(d)(4).

110.    Upon information and belief, Defendants violated the Act by (i) entering into a viatical settlement contract prior to the application of or issuance of the Policy that is the subject of the viatical settlement contract; (ii) soliciting or marketing the purchase of the Policy for the purpose of settling the Policy; and/or (iii) entering into a viatical settlement contract within two years of the issuance of the Policy in violation of the Act.

111.    Upon information and belief, Iantoni and GTI through its President, principal and agent, Iantoni, further violated the Act by making a statement or representation to the Insured in connection with the sale or financing of the Policy to the effect that the insurance is free or without cost to the policyholder for a period of time.

112.    Upon information and belief, the Defendants further violated the Act by knowingly and for the purpose of pecuniary gain presenting or causing to be presented to Nationwide false material information or concealing material information, as part of, in support of, or concerning a fact material to the Application for the Policy by misrepresenting (i) that there had been no discussions about the possible sale or assignment of the Policy to a life settlement, viatical or other secondary market purchaser or provider, (ii) that no portion of the current or future premiums on the Policy would be financed, (iii) that payment would not be

received in connection with the insurance issued on the basis of the Application, and (iv) the purpose for which the insurance was being obtained.

113.     Upon information and belief, the Defendants also violated the Act by knowingly and for the purpose of pecuniary gain, entering into an act, practice or arrangement which constitutes STOLI as defined by the Act.

114.     Upon information and belief, the Defendants violated the Act by entering into, negotiating, brokering or otherwise dealing in a viatical settlement contract involving the Policy which was obtained by presenting false information concerning facts material to the Policy or through the concealment of facts to the Policy for the purpose of misleading and with the intent to defraud Nationwide.

115.     As a result of the violations of the Act, Nationwide has sustained and will continue to sustain the aforementioned damages and may sustain additional damages in the future.  Such damages are a result of the collective violations of the Act of the Defendants.

**COUNT IX**

**<u>VIOLATIONS OF THE ILLINOIS INSURANCE CODE</u>**

**(Against All Defendants)**

116.     Nationwide hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

117.     The Illinois Insurance Code prohibits the payment and acceptance of rebates.

118.     Section 215 ILCS 5/151(1) provides that "no insurance agent or broker shall offer, promise, allow, give, set off or pay, directly or indirectly, any rebate of or part of the premium payable on the policy, or on any policy or agent's commission thereon or earnings,  profits, dividends or other benefits founded, arising, accruing or to accrue thereon or

therefrom, or any special advantage in date of policy or age of issue, or any paid employment or contract for services of any kind or any other valuable consideration or inducement to or for insurance on any risk in this State, now or hereafter to be written, or for or upon any renewal of any such insurance, which is not specified in the policy contract of insurance, [] or other thing of value whatsoever as inducement to insurance or in connection therewith, or any renewal thereof which is not specified in the policy. […]."

119.    The Insurance Code further provides that "[n]o insured person or party or applicant for insurance shall directly or indirectly receive or accept, or agree to receive or accept any rebate of premium or of any part thereof or all or any part of any agent's or broker's commission thereon, or any favor or advantage, or share in any benefit to accrue under any policy of insurance, or any valuable consideration or inducement, other than such as is specified in the policy."  § 215 ILCS 5/151(2).

120.    Upon information and belief, Iantoni and GTI, by and through its President, Iantoni, violated the Insurance Code by offering, promising, allowing, giving, setting off or paying, directly or indirectly, a rebate of or part of the premium payable on the Policy and/or the commission, earnings, profits, dividends or other benefits arising accruing thereon or therefrom.

121.    Upon information and belief, Iantoni and GTI, by and through its President, Iantoni, violated the Insurance Code by further providing other valuable consideration or inducement to or for the Policy which was not specified in the Policy contract.

122.    Upon information and belief, the Insured and/or Hearsh violated the Insurance Code by directly or indirectly receiving or accepting, or agreeing to receive or accept a rebate of premium or part thereof or all or any part of GTI's or Iantoni's commission on the Policy and/or

by sharing in any benefit to accrue under the Policy or any valuable consideration or inducement which was not specified in the Policy.

123.    As a result of the violations of the Insurance Code, Nationwide has sustained and will continue to sustain the aforementioned damages and may sustain additional damages in the future.  Such damages are a result of the collective violations of the Insurance Code by the Defendants.

## RELIEF REQUESTED

WHEREFORE, Nationwide respectfully requests the entry of a judgment:

A.    Finding that GTI breached its contract with Nationwide;

B.    Ordering the return of commission to Nationwide;

C.    Ordering GTI to indemnify Nationwide for all of Nationwide's losses, claims, damages, liabilities or expenses, including but not limited to attorneys' fees;

D.    Declaring that the Policy is void *ab initio* due to material misrepresentations made in connection with the Policy or, in the alternative, is subject to rescission;

E.    Declaring that the Policy is void *ab initio* due to a lack of insurable interest at the inception of the Policy;

F.    Declaring that Nationwide may retain some or all of the premium paid on the Policy;

G.    Declaring that Defendants are estopped from seeking a return of the premium paid on the Policy due to the fraudulent nature in which the Policy was procured and otherwise offset Nationwide's costs;

H.    Awarding Nationwide compensatory damages;

I.    Awarding Nationwide consequential damages;

J.      Awarding Nationwide punitive damages;

K.      Awarding Nationwide interest;

L.      Awarding Nationwide attorneys' fees and costs, as determined by the Court; and

M.      Awarding Nationwide such further relief as this Court deems appropriate.




Dated:  May 23, 2013

                          Respectfully submitted,


                          s/ Terri L.Ahrens
                          Terri L. Ahrens
                          DRINKER BIDDLE & REATH LLP
                          191 N. Wacker Dr., Suite 3700
                          Chicago, IL 60606-1698
                          (312) 569-1000
                          terri.ahrens@dbr.com


                          Of Counsel
                          Charles J. Vinicombe (Pro Hac Vice to be filed)
                          Nicole C. Wixted (Pro Hac Vice to be filed)
                          Laura M. Zulick (Pro Hac Vice to be filed)
                          DRINKER BIDDLE & REATH LLP
                          One Logan Square, Suite 2000
                          Philadelphia, PA  19103-6996
                          (215) 988-2700
                          charles.vinicombe@dbr.com
                          nicole.wixted@dbr.com
                          laura.zulick@dbr.com

                          Attorneys for Plaintiff
                          NATIONWIDE LIFE AND ANNUITY
                          INSURANCE COMPANY